## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NSC WHOLESALE HOLDINGS LLC, *et al.*,[1] | ) Case No. 18-12394 (____) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## DECLARATION OF MARK SAMSON IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Mark Samson, hereby declare, under penalty of perjury, that the following information

is true to the best of my knowledge, information and belief

1.       I am a Managing Director with Getzler Henrich & Associates, LLC and the Chief

Restructuring Officer (the "**CRO**") of NSC Wholesale Holdings LLC, a Delaware corporation

("**NSC**") and each of the other affiliated entities identified in Footnote 1 hereof (collectively, the

"**Debtors**"), that have contemporaneously filed related voluntary petitions for relief under

chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "**Bankruptcy**

**Code**") in this Court.  I understand that NSC is the sole shareholder and/or managing member of

NSC Realty Holdings LLC, NSC of West Hempstead, LLC, Teara LLC and BP Liquor LLC.  I

further understand that Noah Rosen is the managing member of Top Key, but NSC essentially

---

[1]       The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NSC Wholesale Holdings LLC (6210); National Wholesale Liquidators of Lodi, Inc. (4301); NSC Realty Holdings LLC (4779); NSC of West Hempstead, LLC (5582); Top Key LLC (7503); BP Liquor LLC (2059); and Teara LLC (8660).  The Debtors' mailing address is 111 Hempstead Turnpike, West Hempstead, NY 11552.

manages its business. NSC and National Wholesale Liquidators of Lodi, Inc. ("**NWL Lodi**") have identical multi-member ownership structures.[2]

2.      For approximately the last month, I have served as the Debtors' financial advisor. Earlier today, I was appointed as the Debtors' CRO.  As CRO I have the sole right and power to make decisions regarding the Debtors' restructuring efforts and the Debtors' chapter 11 cases.

3.      In my roles as financial advisor, and now CRO, I, with the assistance of other members of the Debtors' management and the Debtors' outside legal counsel and other consultants, have also been actively involved in the Debtors' efforts to develop restructuring strategies and otherwise preserve and maximize the value of their assets.  I am authorized by the Debtors to submit this Declaration in support of the Debtors' petitions and various First Day Pleadings (defined below). I am familiar with the Debtors' operations, business records, financial affairs and related agreements and contracts.

4.      Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information and belief, and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtors' industry, operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

5.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of Bankruptcy Code. To enable the Debtors to operate effectively and preserve the value of estate assets, the Debtors have requested various types of

---

[2]     NSC and  NWL Lodi are each owned as follows: Eva Rosen Trust FBO Scott Rosen (33.34%); Eva Rosen Trust FBO Carrie Rosen (33.33%); Eva Rosen Trust FBO Neil Rosen (33.33%).

relief in "first-day" applications and motions filed with this Court contemporaneously herewith (collectively, the "**First Day Pleadings**").

6.      I submit this Declaration in support of the Debtors' bankruptcy petitions and First Day Pleadings.  Any capitalized term not defined herein shall have the meaning ascribed to such term in the applicable First Day Pleading.  The First Day Pleadings seek, among other things, to: (a) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; (b) preserve customer relationships; (c) maintain employee morale and confidence; and (d) establish certain other administrative procedures to promote a smooth transition into chapter 11.  Gaining and maintaining the support of the Debtors' employees, customers and other key constituencies, as well as maintaining the operations of the Debtors' business with minimal disruption, will be critical to the Debtors' efforts and in maximizing recovery prospects for all interested constituencies.

7.      Part I of this Declaration describes the Debtors' business and the circumstances surrounding the filing of the chapter 11 petitions.  Part II sets forth the relevant facts in support of the First Day Pleadings.  Part III concludes that the relief requested in the First Day Pleadings is in the best interests of the Debtors, their creditors and estates and therefore should be granted.

## PART I

## BACKGROUND

### A.      General Background

8.      The Debtors own and operate a chain of eleven (11) general merchandise close-out stores located in four (4) states: Massachusetts, New Jersey, New York and Pennsylvania (collectively, the "**Stores**").  The Stores, which operate under the name "National Wholesale Liquidators," are targeted to lower and lower/middle income customers in densely populated

urban and suburban markets.  The Debtors employ a unique hybrid merchandising strategy that employs both continuity and close-out products.  The Debtors offer customers both an everyday selection of first quality, brand name merchandise and opportunistic and varying special buys.

9.      While NSC is the primary operating entity for the Debtors' business enterprise, NWL Lodi and Top Key also maintain limited operations.  NWL Lodi operates the Store at the Debtors' Lodi, New Jersey location and Top Key operates a liquor store within the Debtors' Long Island City, New York Store.

10.      NSC Realty Holdings LLC is the primary lessor with respect to the Debtors' West Hempstead Store and corporate headquarters location, which in turn is sub-leased to NSC of West Hempstead, LLC.  BP Liquor LLC exists solely to hold the liquor license with respect to the Debtors' Bay Parkway, New York Store.  Teara LLC is an inactive company that was originally intended to be used in connection with internet sales.

11.      The Debtors' average Store size is 54,000 square feet, with their largest Store sized at more than 150,000 square feet.  The Debtors also maintain a warehouse in Edison, New Jersey and corporate offices in West Hempstead, New York.  Prior to the Petition Date, the Debtors announced the closing of a retail location in Middletown, New York.

12.      As of the Petition Date, the Debtors had 695 employees, 629 of whom are employed on a full time basis and 66 of whom are employed part time. Of the Debtors' 695 employees, 611 are compensated on an hourly basis and 84 are compensated on annual salary basis.   Moreover, 538 of the Debtors' store-level employees are unionized (the "**Union Employees**").  The Union Employees' terms of employment are governed in part by the terms of a certain Collective Bargaining Agreement with Amalgamated Local 298 AFL-CIO, dated as of December 1, 2017 (the "**CBA**").

-4-

13.     Despite historically strong performance on a store-by-store basis, the Debtors' liquidity and financial performance has been adversely affected by several unanticipated factors, including construction-related damages that resulted in the closing of one of the Debtors' most profitable Stores and costly delays in opening a new Store location.  Like many retailers, over the last few years, the Debtors have also experienced declining sales and rising costs associated with doing business as a predominantly "brick and mortar" retailer.  The challenges impacting the Debtors have affected their ability to borrow under their prepetition lending facility.  Without additional liquidity, the Debtors' inventory has been shrinking and sales have been declining.

14.     Notwithstanding these challenges, the Debtors believed their financial challenges could be overcome by access to additional liquidity to acquire more inventory and open additional retail stores.  For months prior to the Petition Date, the Debtors were negotiating with a group of industry players for a significant equity investment in the Debtors' businesses. Unfortunately, after substantially completing due diligence, the potential equity investors informed the Debtors that they were not prepared to move forward with an equity investment.

15.     Instead of an equity investment, the potential equity investors expressed interest in purchasing substantially all of the Debtors' assets through a sale under section 363 of the Bankruptcy Code.  Similarly, another group, which includes one of the Debtors' insiders, also expressed an interest in purchasing a portion of the Debtors' assets and businesses as a going concern through a section 363 sale.

16.     In light of these expressions of interest, the Debtors retained an investment banker, SSG Advisors, LLC ("**SSG**"), to assist them in marketing their assets, negotiating with interested parties, and facilitating due diligence.

24888277.13 10/24/2018

17.     Despite SSG's efforts, none of the parties that expressed interest in purchasing the Debtors' assets as a going concern made a meaningful proposal which, in the Debtors' view, would result in better value for the Debtors' estates than proceeding with store closing or similarly themed sales of the Debtors' inventory ("**Closing Sales**").

18.     Accordingly, the Debtors have determined that, under the circumstances, the best way to preserve value for their estates and creditors is to immediately commencing Closing Sales and, at the same time, pursue a sale process for any and all of the Debtors' remaining assets.  The Debtors believe this plan offers the best opportunity to maximize the value to the estates for all creditors and stakeholders.

**C.     Pre-Petition Debt Structure**

(*i*)     *Prepetition Lender*

19.     On or about October 26, 2015, NSC, as Borrower, and NWL Lodi, as Corporate Guarantor, and Capital One, National Association ("**Capital One**"), as Lender, entered into an Amended and Restated Credit Agreement (the "**Credit Agreement**"), pursuant to which Capital One agreed to make available up to a maximum amount of $20,000,000 through a revolving loan (the "**Revolving Loan**"), up to $2,500,000 through a delayed draw term loan (the "**Term Loan**"), and a letter of credit commitment of up to $2,000,000 (collectively with the Revolving Loan and the Term Loan, the "**Loan Facility**").

20.     The Revolving Loan is an asset-based facility, pursuant to which Capital One loans funds to the Debtors in an amount up to  sixty-five percent (65%) of Eligible Inventory (as defined in the Credit Agreement).

-6-

21.     NSC executed an Amended and Restated Revolving Credit Note, in the original principal amount of $20,000,000, evidencing its obligation to repay any and all amounts loaned to it by Capital One.

22.     Debtors NWL Lodi, NSC Realty Holdings, LLC, NSC of West Hempstead, LLC, Top Key, Teara LLC, and BP Liquor LLC executed an Amended and Restated Guaranty Agreement with respect to the obligations under the Loan Facility.

23.     As security for the obligations under the Loan Facility, all of the Debtors also executed an Amended and Restated Security Agreement, whereby each of the Debtors granted to Capital One a first-position security interest in substantially all of the Debtors' assets, including the Debtors' cash (the "**Cash Collateral**").

24.     As of October 1, 2018, the Debtors are indebted to Capital One in the total amount of not less than $8,575,000 in connection with the Revolving Loan, $756,000 in connection with the Term Loan, and not less than $125,000 in connection with the letter of credit commitment.

*(ii)*     *True Value*

25.     On or about September 24, 2014, NSC entered into a Retail Member Agreement with True Value Company ("**True Value**"), a cooperative of independent retailers.  NSC granted True Value a security interest in inventory sold, leased or consigned to NSC by True Value, and NSC's receivables and other rights arising from inventory acquired from True Value. As of the Petition Date, the Debtors' books and records indicate that NSC is indebted to True Value in the total amount of approximately $107,516 and that the Debtors have True Value inventory on hand in the amount of approximately $395,000.

(iii)    *Unsecured Obligations*

26.    The Debtors estimate aggregate unsecured debt of approximately $27.2 million as of the Petition Date.  These obligations are generally owed to trade creditors (i.e., suppliers of inventory and equipment), and landlords with respect to the Debtors' Store locations.

## PART II

## FIRST DAY PLEADINGS

27.    An important (and in many respects critical) element of the success of these chapter 11 cases (the "**Chapter 11 Cases**") will be the entry of orders granting the relief requested in each of the First Day Pleadings. Generally, the First Day Pleadings are designed to facilitate: (a) the continuation of the Debtors' existing cash management systems and other business operations without interruption; (b) preservation of customer relationships; (c) maintenance of employee morale and confidence; and (d) establishment of certain other administrative procedures to promote a smooth transition into chapter 11.  The relief requested in the First Day Pleadings is necessary to avoid immediate and irreparable harm to the Debtors, and consequently, Rule 6003 of the Federal Rules of Bankruptcy Procedure, to the extent applicable to any particular First Day Pleading, has been satisfied. The factual background in support of each First Day Pleading is provided below:

**A.    Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")**

28.    Through the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of the Debtors' Chapter 11 Cases and the consolidation thereof for procedural purposes only.

29.    NSC is a Debtor in these Chapter 11 Cases, and each of the other Debtors is an affiliate of NSC.

-8-

**B.**   **Motion of the Debtors for an Order Authorizing Debtors to (I) File a Consolidated List of Creditors, (II) File a Consolidated List of Debtors' Twenty Creditors Holding Largest Unsecured Claims and (III) Mail Initial Notices (the "Creditor Matrix Motion")**

30.    Through the Creditor Matrix Motion, the Debtors seek entry of an order: authorizing the Debtors to: (i) maintain and file a consolidated list of creditors; (ii) file a consolidated list of the Debtors' twenty (20) creditors holding the largest unsecured claims in lieu of filing lists for each Debtor; and (iii) mail initial notices.

31.    The Debtors have identified over 1,400 entities to which notice of certain proceedings in the Debtors' Chapter 11 Cases must be provided.

32.    The Debtors, with the assistance of their proposed claims agent, Omni Management Group ("**Omni**"), currently keep and update various lists of the names and addresses of each of their respective creditors that will be entitled to receive certain notices and other pleadings filed in the Chapter 11 Cases.   The Debtors believe that the information contained in these files can be consolidated and used in an efficient manner to provide Notices and other pleadings to parties in interest as required in the Chapter 11 Cases.

33.    Upon consultation with Omni, the Debtors believe that filing the lists in the formats currently maintained in the Debtors' ordinary course of business will be sufficient to allow Omni to promptly notify all applicable parties as required in the Chapter 11 Cases.

34.    Due to the number and nature of creditors in these cases, the Debtors submit that a single consolidated list of their combined twenty (20) largest unsecured creditors in these cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors.   Other than jointly held guarantee obligations, most of the Debtors, other than NSC, have no independent operations or creditors.   Accordingly,

the Debtors respectfully request authorization to file a single consolidated list of their twenty (20) largest unsecured creditors in these Chapter 11 Cases.

**C.      Motion of Debtors for Interim and Final Orders Authorizing (A) Continuation of Existing Cash Management System, (B) Maintenance of Existing Business Forms and Bank Accounts, (C) Continuation of Intercompany Transactions, and (D) Payment of Related Prepetition Obligations (the "Cash Management Motion")**

35.      Through the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors to (a) continue using their existing cash management system, (b) continue using their existing business forms and bank accounts, (c) continue their intercompany transactions, and (d) pay related prepetition obligations.

*(i)      The Cash Management System*

36.      Prior to the Petition Date, the Debtors employed a cash management system to collect funds generated by their operations and to disburse funds to satisfy obligations incurred in the ordinary course of their businesses (the "**Cash Management System**").    The Cash Management System consists of five bank accounts (the "**Bank Accounts**").

37.      The Debtors maintain the following three Bank Accounts at Capital One: (a) an operating account (the "**Master Depository Account**"), (b) a controlled disbursement account, and (c) a rebate account (the "**Rebate Account**").  The Debtors also maintain two bank accounts at Bank of America, N.A. ("**Bank of America**" and, collectively with Capital One, the "**Banks**"), an armored truck deposit account (the "**Armored Truck Account**") and a separate account for Top Key (the "**Top Key Account**" and, collectively with the Armored Truck Account, the "**Bank of America Accounts**").

38.     A summary of the Debtors' Bank Accounts is set forth below:

| Bank Account | Controlling Debtor Entity | Account Description | Last Four of Account Number |
|---|---|---|---|
| Capital One | NSC Wholesale Holdings LLC | operating account | 0419 |
| Capital One | NSC Wholesale Holdings LLC | controlled disbursement account | 1760 |
| Capital One | NSC Wholesale Holdings LLC | rebate account | 0427 |
| Bank of America | NSC Wholesale Holdings LLC | armored truck deposit account | 3484 |
| Bank of America | Top Key LLC | separate account required in connection with liquor license | 3201 |

39.     As a general matter, other than the specified limited uses described herein, the entirety of the Debtors' Cash Management System is run through the Master Depository Account.  With the exception of funds directed to the Bank of America Accounts, all cash and other receipts generated by the operation of the Debtors' businesses are deposited into the Master Depository Account.

40.     In the ordinary course of business, the Debtors offer certain rebates ("**Rebates**") for their customers, which are described more fully in the *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Honor Certain Prepetition Programs in the Ordinary Course of Business and (II) Granting Certain Related Relief* (the "**Customer Programs Motion**"). Rebates are paid directly to qualifying customers from the Rebate Account.  Funding for the Rebate Account is maintained by periodic transfers from the Master Depository Account on an as-needed basis.

41.     The Armored Truck Account is a separate account at Bank of America maintained to facilitate deposits from an armored truck service in connection with the Debtor's Dorchester,

Massachusetts location. Cash receipts from the Lodi Store are also taken by armored truck on a regular basis, and the armored truck service maintains a deposit relationship with Bank of America. The Debtors also utilize the Armored Truck Account to receive deposits from American Express credit card transactions for certain of the Debtors' stores (all other credit card transactions, including American Express at the other locations, are deposited directly in to the Master Depository Account). The funds deposited into the Armored Truck Account are swept by the Debtors, typically on a weekly basis, into the Master Depository Account.

42.    Finally, the Top Key Account is a separate account maintained by Top Key LLC, which operates a liquor store within the Debtors' Long Island City, New York location, as required by applicable law with respect to liquor stores in New York. Cash receipts and direct expenses of Top Key are paid from the Top Key Account, and any remaining funds are transferred to the Master Operating Account in payment of intercompany balances owed to NSC by Top Key in the ordinary course of business.

(ii)    *Credit Card Programs*

43.    In the ordinary course of business, the Debtors utilize credit cards issued by Capital One, Citi, and American Express (together, the "**Credit Cards**") through certain of the Debtors' employees. The Debtors' employees use the Credit Cards to pay for business expenses incurred in the ordinary course of business.

(iii)    *Intercompany Transactions*

44.    The scope of the Debtors' intercompany transactions (the "**Intercompany Transactions**") is generally limited to transferring surplus funds from the Top Key Account into the Master Depository Account. The Intercompany Transactions are routine and necessary for the payment of ordinary course expenses incurred by NSC on behalf of Top Key. Other than

-12-

with respect to the Top Key Account, all of the Debtors' bank accounts are held by NSC, such that all other transfers merely reflect the ordinary flow of funds from one account to another held by the same entity.

45.     The Debtors maintain records of transfers of cash and can trace and account for all Intercompany Transactions.  The Debtors will continue to maintain such records.  If the Intercompany Transactions were terminated, the Cash Management System would be disrupted to the detriment of the Debtors and their estates.

*(iv)     Bank Fees*

46.     The Debtors incur approximately $10,000 per month in various fees in connection with their Bank Accounts, including $6,000 in bank fees and $4,000 in unused line of credit fees (together, the "**Bank Fees**").  These fees are automatically deducted each month by Capital One, and therefore no Bank Fees should be due as of the Petition Date.  The Debtors seek authority to continue paying the Bank Fees in the ordinary course of business.

*(v)     Existing Business Forms*

47.     In the ordinary course of business, the Debtors use a variety of correspondence and business forms, including purchase orders and checks (collectively, the "**Business Forms**"). To minimize the expense to the Debtors' estates associated with developing or purchasing entirely new forms, the delay in conducting business before obtaining such forms, and the confusion of suppliers and other vendors, the Debtors seek authority to continue using their Business Forms substantially in the forms used immediately before the Petition Date, without reference therein to the Debtors' status as "Debtors-in-Possession."

24888277.13 10/24/2018

48.     The relief requested in the Cash Management Motion is essential to facilitate the orderly operation of the Debtors' business and reorganization process.

**D.     Motion of Debtors for Interim and Final Orders (I) Authorizing, but not Directing, Debtors to (A) Pay and Honor Prepetition Wages, Salaries, Other Compensation, Reimbursable Business Expenses, and Employee Benefit Obligations, and (B) Maintain and Continue Certain Compensation and Benefit Programs Postpetition; and (II) Granting Related Relief (the "Employee Compensation Motion")**

49.     Through the Employee Compensation Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in accordance with their past and current policies and practices, to: (a) pay unpaid prepetition wages, salaries, and accrued compensation including incentive compensation, health and welfare benefit obligations, and reimbursable business expenses, as applicable to the Workforce (as defined herein), and all costs related thereto (collectively, the "**Workforce Obligations**"); (b) maintain and continue to honor the Workforce Obligations as they were in effect as of the Petition Date and as such may be modified, amended or supplemented from time to time in the ordinary course.

50.     The Debtors' employees are paid weekly.  The Debtors' last payroll was paid to employees on October 24, 2018, for the period from October 15, 2018 through October 21, 2018. The next payroll should be paid on November 1, 2018 for the period from October 22, 2018 through October 28, 2018.   This pay period will capture three (3) prepetition days (the "**Prepetition Pay Period**").  Accordingly, the Debtors request authority to pay their employees the amounts owed for Workforce Obligations for those prepetition days in the next scheduled payroll.  No single individual will be paid over the statutory cap of $12,850 on account of any prepetition claim for wages, benefits, or other compensation, absent further order of the Court.

51.     The categories of payments sought to be made on account of the prepetition Workforce Obligations, which are described in more detail below, are estimated to be as follows:

-14-

- Wages & Salaries - $160,000
- Incentive Compensation - $4,000
- Reimbursable Business Expenses - $5,000[3]
- Benefit Programs - $95,000

(i)    *The Debtors' Workforce*

52.    The Debtors employ 695 employees, comprised of approximately 629 full-time employees and 66 part-time employees (the "**Workforce**").  Of the employees in the Workforce, 611 of the Debtors' employees are compensated on an hourly basis and 84 employees are compensated on annual salary basis.

53.    Many of the Debtors' store-level and warehouse employees are unionized (the "**Union Employees**").  Of the Debtors' total Workforce, there are 538 Union Employees.  The Union Employees' terms of employment are governed in part by the terms of the CBA.  Per the CBA, the Union Employees include "full time and part time employees employed by the Employer, excluding clerical and office employees, store managers, assistant store managers, department managers, management trainees, head cashiers, receiving manager, guards, supervisors, confidential, managerial and professional employees as defined in the National Labor Relations Act of 1947, as amended[,]" employed at all locations (present or future), including Lodi, Long Island City, Bay Parkway, Coop City, Dorchester, Middletown, Jersey City, Flushing, Dorchester, Philadelphia, Rosedale, and West Hempstead.

54.    The CBA governs, *inter alia*, hours of work, rates of pay, and discharge and discipline for the Union Employees.  The CBA expires on November 30, 2020.

---

[3]    The amount of Reimbursable Business Expenses cannot be determined until all requests for reimbursement are submitted and processed.  The amounts set forth herein include those known and estimated based on prior historical performance.

55.    The Debtors submit that any delay in paying the Workforce Obligations will adversely impact the Debtors' relationships with their Workforce and could irreparably harm the Workforce's morale, dedication, confidence, and cooperation.    The Debtors cannot risk the substantial damage to their business that would certainly occur if such delay or failure were to happen.

56.    At the same time, the vast majority of the Workforce relies exclusively on their compensation and benefits to pay their daily living expenses and to support their families.    Thus, members of the Workforce will be exposed to significant financial constraints if the Debtors are not permitted to continue paying wages and salaries, providing employee benefits, and maintaining certain programs in the ordinary course of business.    Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of the Chapter 11 Cases.

*(ii)    Employee Compensation*

*(A)    Wages and Salaries*

57.    Employee compensation is comprised of base wages and salaries ("**Wages and Salaries**"), including incentive based compensation ("**Incentive Compensation**").    As of the Petition Date, the Debtors' average gross payroll is approximately $280,000 per pay period for the employees.

58.    In addition, the Debtors estimate that their employees have accrued approximately $183,000 in unused vacation.    The Debtors seek authority to continue honoring accrued vacation in the ordinary course of business by permitting employees to take regularly scheduled vacations. In addition, to the extent employees are laid off or otherwise terminated after the Petition Date,

-16-

the Debtors seek authority to pay such employees the cash value of such employee's accrued vacation at the time of termination.

59.    In the ordinary course of business, the Debtors incur payroll obligations for Wages and Salaries.  Because employees are paid in arrears, employees are owed accrued but unpaid Wages and Salaries as of the Petition Date.  As of the Petition Date, the Debtors estimate that they owe approximately $160,000 in the aggregate to employees on account of the Prepetition Pay Period.

(B)    <em>Incentive Compensation</em>

60.    Prior to the Petition Date, in the ordinary course of business, the Debtors maintained at least one ordinary course Incentive Compensation program for individuals that operate company stores; the compensation is sale-based.

61.    More specifically, the Incentive Compensation program provides a 1-5% payment to employees who sell furniture.  This program includes approximately 14 members of the Debtors' Workforce.  During a recent pay period, Incentive Compensation totaled approximately $2,700.

62.    As of the Petition Date, the Debtors estimate that they owe approximately $4,000 on account of Incentive Compensation to members of the Debtors' Workforce.  The amount of Incentive Compensation is determined on a weekly basis.

(C)    <em>Reimbursable Business Expenses</em>

63.    Prior to the Petition Date and in the ordinary course of business, the Debtors reimburse certain members of their Workforce for approved, reasonable expenses incurred in the scope of their employment on behalf of the Debtors.  These expenses include business travel

-17-

costs, meals, supplies and other business-related expenses (the "**Reimbursable Business Expenses**").

64.    As of the Petition Date, the Debtors estimate that they owe *at least* $5,000 on account of unpaid obligations related to Reimbursable Business Expenses arising during the Prepetition Pay Period.   The exact amount of Reimbursable Business Expenses cannot be determined until all requests for reimbursement are submitted and processed; the $5,000 amount corresponds with requests already submitted and an estimate based on historical performance.

*(D)    Health and Welfare Benefits Programs*

65.    The Debtors maintain and/or contribute to employee benefit programs for employees, including, but not limited to, medical insurance, dental insurance, disability insurance, and life insurance (collectively, the "**Benefit Programs**").   The costs of the Benefit Programs are either (a) paid fully by the Debtors, (b) shared by the Debtors and the Employees, or (c) paid fully by the Employees, depending on the program.   The Workforce contributes to the costs of the Benefit Programs through deductions from their paychecks.

66.    Average costs for the Benefit Programs are as follows:

| Insurance Type | Payee | Payor | Average Monthly Cost |
|---|---|---|---|
| Medical Insurance | Local 298 (Union) | 50%  Company 50% Employee | $90,000 per month |
| Medical Insurance | Oxford | 100% Company | $7,300 per month |
| Medical Insurance | AFLAC | 100% Employee | $1,700 per month |
| Dental Insurance | Principal | 100% Company | $1,300 per month |
| Disability and Family Medical Leave Act | Standard Security Life Insurance Company | 50% Company 50% Employee | $7,000 per quarter |

67.     The Debtors estimate that approximately $95,000 will become due and payable shortly after the Petition Date in connection with the Prepetition Pay Period. By this Motion, the Debtors request authority, but not direction, to honor and pay the Benefits Programs for the Prepetition Pay Period and to continue to pay for its share of the Benefits Programs in the ordinary course of business on a postpetition basis.

*(iii)*     *Payroll Administration Fees*

68.     The Debtors use Paycor to administer their payroll and time management systems, and Cincinnati Time Recorder ("**CTR**") to record and monitor time clocks used by employees. Between Paycor and CTR, the Debtors pay approximately $2,100 per week for these administrative services; these amounts are automatically deducted from payroll funds.  As of the Petition Date, the Debtors were current with their obligations to Paycor and CTR.

*(iv)*     *Tax and Withholding Obligations*

69.     The Debtors routinely deduct certain amounts from employees' compensation that represent various Withholding Obligations that the Debtors are required to remit to third parties, including, for example, various federal, state and local income, and Federal Insurance Contribution Act and other taxes (collectively, the "**Employee Withholdings**").  On average, the amount deducted and remitted by the Debtors in respect of Employee Withholdings totals approximately $64,120 per pay period.   As of the Petition Date, all applicable Employee Withholdings were remitted to the applicable third parties.

70.     Should any prepetition amounts become due and owing in connection with the Employee Withholdings, the Debtors believe that these amounts, which are held for payment to a third party (e.g., the taxing and regulatory authorities) and are properly deemed to be held in trust, do not constitute property of the Debtors' estates.

-19-

**E.      Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Honor Certain Prepetition Customer Programs in the Ordinary Course of Business and (II) Granting Certain Related Relief (the "Customer Programs Motion")**

71.      Through the Customer Programs Motion, the Debtors seek entry of an order (i) authorizing the Debtors to honor certain prepetition customer programs in the ordinary course of business and (ii) granting certain related relief.

72.      Prior to the Petition Date, and in the ordinary course of their business, the Debtors engaged in a variety of marketing and sales practices designed to develop and sustain customer satisfaction and loyalty (collectively, the "**Customer Programs**").  As described herein, the Customer Programs include, without limitation, Gift Cards, Rebates, Refunds, Reward Cards and Customer Financing (each as defined herein).  The goal of the Customer Programs are to meet competitive pressures, ensure customer satisfaction, and generate goodwill for Debtors, thereby retaining current customers, attracting new customers, and ultimately enhancing revenue and profitability.

*(i)      Gift Card Program*

73.      The Debtors historically employed a gift card program through which customers could purchase a pre-paid card to use as an alternative to cash for purchases within the store (the "**Gift Cards**").

74.      The Debtors believe there are no outstanding Gift Cards issued, as any Gift Cards issued would have expired.  However, out of an abundance of caution, the Debtors seek authority to continue to honor Gift Cards in the ordinary course of business during the pendency of the Chapter 11 Case, including if purchased before the Petition Date.

-20-

(ii)    _Rebates_

75.    In the ordinary course of business, the Debtors offer Rebates to customers in connection with certain purchases.  Rebates are typically in a relatively *de minimis* amount, ranging between $1 and $5 per applicable purchase.  After making a qualifying purchase, the customer may mail a completed rebate form back to the Debtors, who then issue a check back to the customer from the Debtors' bank account designated for Rebates.

76.    The Debtors believe that the costs of the Rebates are far outweighed by the benefits, through increased purchases, customer loyalty and customer satisfaction.  The Debtors' most loyal customers look for Rebates when shopping at the Debtors' locations.  Accordingly, Rebates spur increased shopping and revenue generation.

77.    It is impossible for the Debtors to predict with any certainty the total amount of outstanding Rebate obligations as of the Petition Date since many customers purchase products for which Rebates may be submitted but never in fact submit the necessary paperwork. Historically, the Debtors receive and process approximately $2,000 in Rebates per month.

78.    If the Debtors were unable to honor existing Rebates, the resultant customer backlash could be catastrophic. Traditionally loyal customers may cease shopping at the Debtors' stores if their Rebates are not honored, and customers may turn to the Debtors' competitors if the Debtors are unable to honor their existing and ongoing Rebate obligations.

(iii)    _Returns, Exchanges and Refunds_

79.    Certain of the Debtors' customers may hold contingent claims against Debtors for refunds, returns, exchanges, substitutions, store credit and other credit balances (collectively, the "**Refunds**").  Subject to certain restrictions and requirements, customers may request a refund or exchange for the full amount of a purchased item.  Unused portions of the return dollar amount

-21-

are returned to the customer in the form of the original payment.  In certain circumstances, such as when the customer no longer possesses the receipt, the customer may exchange his or her purchase for store credit in the amount of the full retail price.  The Debtors believe that the increase in and maintenance of customer loyalty generated by the Refunds outweighs the cost of the Refunds.

(iv)    *Reward Cards*

80.    In the ordinary course of business, the Debtors issue reward cards ("**Reward Cards**") to their customers.  Reward Cards enable customers to accumulate "points" based on their purchases in the Debtors' stores.  Once customers accumulate sufficient points, they receive benefits such as discounts on future purchases.  Specifically, for every 200 points accumulated, customers receive a $5 coupon that can be used to discount future purchases.

81.    The Reward Cards have no direct cash value, and the only liability the Debtors may incur in connection therewith relates to discounts from future purchases.  The Debtors believe that the loss of future sales revenue that would result if the Debtors do not continue to honor Rewards Cards would outweigh any costs involved in continuing to honor Reward Cards for customers in the ordinary course of business.

(v)    *Customer Financing*

82.    In the ordinary course of business, the Debtors maintain relationships with independent third-party finance companies that offer financing options to the Debtors' customers (collectively, "**Customer Financing**").  Practically speaking, the Debtors merely operate as an intermediary – connecting customers who desire financing with the finance companies.  By way of example, if a customer wishes to finance his or her purchase of a higher priced item, the Debtors will facilitate such Customer Financing by providing the customer with a credit

-22-

application from one of the independent finance companies.  If approved, the finance company will fund the customer's purchase and the customer will repay the finance company pursuant to the terms offered by the finance company.

83.     While the Debtors' relationship with the independent finance companies are governed by various contracts, the Debtors have no monetary liability to the finance companies, nor do they bear any liability with respect to the Customer Financing relationships created between the finance companies and the Debtors' customers.  The Debtors merely facilitate the connection so that their customers can apply for financing directly to the third party.

**F.      Motion of Debtors for Interim and Final Orders (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service  (the "Utilities Motion")**

84.     Through the Utilities Motion, the Debtors seek entry of interim and final orders (i) approving the Debtors' proposed form of adequate assurance of payment for postpetition Utility Services (as hereinafter defined); (ii) establishing procedures for resolving objections by Utility Companies (as hereinafter defined) relating to the adequacy of the proposed adequate assurance; and (iii) prohibiting Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on the basis of the commencement of the Chapter 11 Cases or that a debt owed by the Debtors for Utility Services rendered before the Petition Date (as hereinafter defined) was not paid when due.

85.     To operate their businesses and manage their properties, the Debtors obtain telecommunications, water, gas, electricity, and other utility services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Companies**").  A nonexclusive list of Utility Companies that provide Utility Services to the Debtors as of the

-23-

Petition Date is provided on <u>Exhibit 1</u> annexed to the forms of order submitted with the Utilities Motion (the "**Utility Services List**").[4]

86.     Historically, the Debtors have a good payment record with the Utility Companies. To the best of the Debtors' knowledge, there are no defaults or arrearages of any significance for the Debtors' undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of the Chapter 11 Cases.  Based on their monthly average for the twelve (12) months before the Petition Date, the Debtors estimate that their cost of Utility Services for the next thirty (30) days will be approximately $250,000.

87.     Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, the success of the Debtors' restructuring efforts.  Without telecommunications, water, gas, electricity, and other standard utility services, the Debtors would be unable to operate their various retail locations and headquarters.  Should any Utility Company alter, refuse, or discontinue service, even briefly, the Debtors' business operations could be severely disrupted. The Debtors coordinate their businesses and retail operations through their headquarters in West Hempstead, New York and their 11 retail locations in New York, New Jersey, Massachusetts and Pennsylvania.  Interruption of the Utility Services provided at these locations would disrupt the Debtors' ability to communicate with and provide services to their employees, vendors and customers.  Such interruption would negatively impact the Debtors' restructuring efforts and all parties-in-interest.

---

[4]     The inclusion of any entity in, or omission of any entity from, the Utility Services List is not an admission by the Debtors that such entity is, or is not, a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve all rights and defenses with respect thereto.

**G.      Motion of Debtors for Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Assessments and (II) Directing Financial Institutions to Honor and Process Related Checks and Transfers (the "Taxes Motion")**

88.      Through the Taxes Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to pay various local, state, and federal taxing authorities (collectively, the "**Taxing Authorities**")[5] all Taxes[6] (as defined below) that arose before the Petition Date (as defined below), including all Taxes subsequently determined by audit or otherwise to be owed for periods before the Petition Date; and (ii) directing applicable banks and financial institutions to receive, honor, process, and pay all checks issued or to be issued and electronic fund transfers requested or to be requested relating to the above.

89.      In connection with the normal operation of their businesses, the Debtors collect, withhold and/or incur an assortment of taxes and assessments that they remit periodically to various Taxing Authorities.

90.      The taxes and assessments to which Debtors are typically subject generally fall into the following categories: sales taxes, corporation taxes, real estate taxes and income taxes (each herein defined and collectively, the "**Taxes**").   Below is a breakdown of the Debtors' typical tax obligations by state and tax type:

| State | Tax Type |
|---|---|
| New Jersey | • Sales Tax<br>• Partnership Income Tax<br>• Corporation Tax<br>• NJ-Urban Enterprise Zone Sales Tax |

---

[5]      The definition of "Taxing Authorities" includes, but is not limited to, those parties set forth on the Taxing Authority List (as defined herein).  The inclusion of any entity on, or the omission of any entity from, the Taxing Authority List is not an admission by the Debtors that such entity is, or is not, a Taxing Authority to which the Debtors owe any amount, and the Debtors reserve all rights with respect to any such determination.

[6]      By the Taxes Motion, the Debtors are not seeking authority to pay employee withholding taxes, which are addressed separately in the *Employee Compensation Motion*, discussed above.

| State | Tax Type |
|---|---|
| Massachusetts | • Sales Tax |
| New York | • Sales Tax<br>• City of New York Unincorporated Business Tax |
| Pennsylvania | • Sales Tax<br>• Partnership Tax<br>• City of Philadelphia Business Income and Receipts Tax<br>• City of Philadelphia Net Profits Tax |
| Delaware | • Annual Corporation Tax |

91.    The Debtors pay Taxes monthly, quarterly or annually, in each case as required by applicable laws and regulations.  During the last calendar year, the Debtors paid a total of approximately $7,794,657 in Taxes, of which $7,785,670 was on account of remittance of Sales Taxes (as defined below).

92.    As noted above, the Debtors' tax liability primarily relates to sales tax, which the Debtors are required in certain states to collect and/or pay (the "**Sales Taxes**") from sales to customers.  The Debtors collect the Sales Taxes on a per sale basis and periodically remit the Sales Taxes to the applicable Taxing Authorities.  Sales Taxes are remitted to the relevant Taxing Authorities on the basis of Sales Taxes actually collected from customers during the prior period.  Sales Taxes are paid on a monthly or quarterly basis, depending on the state.  If the Debtors do not pay the Sales Taxes in accordance with their obligations, then the Debtors will become liable for further amounts in the form of penalties.

93.    The Debtors estimate that approximately $475,000 in Taxes, consisting entirely of Sales Taxes, relating to the prepetition period will become due and owing to the Taxing Authorities during the interim period after the Petition Date.  The Debtors request authority to pay these Taxes on an interim basis.

24888277.13 10/24/2018

94.     The amounts of the Taxes listed above are good faith estimates based on the Debtors' books and records and remain subject to potential and ongoing audits and other adjustments.

**H.    Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, Including Administrative and Broker Fees, (B) Renew, Supplement, or Purchase Insurance Policies, and (C) Honor the Terms of the Premium Financing Agreements; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief (the "Insurance Motion")**

95.     Through the Insurance Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto, including administrative and broker fees, (ii) renew, supplement, or purchase insurance policies in the ordinary course of business, and (iii) honor the terms of the Premium Financing Agreements (defined below) and pay premiums thereunder; (b) authorizing Banks to honor and process check and electronic transfer requests related to the foregoing; and (c) granting related relief.

96.     In the ordinary course of business, the Debtors maintain approximately 24 insurance policies (collectively, the "**Insurance Policies**") that are provided and/or administered by multiple third-party insurance carriers (collectively, the "**Insurance Carriers**").   The Insurance Policies include, among other things, cyber liability, workers' compensation insurance, ocean cargo insurance, director and officer insurance, disability benefits liability insurance, automobile insurance, boiler and machinery insurance, commercial general liability insurance, crime insurance, and property insurance.

97.     A schedule of the current Insurance Policies, policy terms, and annual premium amounts is attached to the Insurance Motion as Exhibit C.

-27-

98.     The Debtors pay for the cost of insurance in one of two ways.  First, they pay premiums in the ordinary course of business (*e.g.*, monthly, quarterly, or annually) from immediately available funds.  Second, in instances where it is economically advantageous to do so, the Debtors finance premiums through BankDirect Capital Finance ("**BankDirect**") and AFCO Credit Corporation ("**AFCO**" and together with BankDirect, the "**Premium Finance Companies**").

99.     Of the Debtors' Insurance Policies, Property and Liability, D&O and Excess Liability policies are financed.  The Worker's Compensation policy is not financed.

100.    In the case of the financed policies (the "**Financed Policies**"), the finance agreements (each a "**Premium Financing Agreement**"), copies of which are attached to the Insurance Motion as <u>Exhibit D</u>, require the Debtors to make an initial down payment followed by installments.

101.    On account of the policies financed with AFCO, the Debtors owe total premiums of $1,361,414.35.  Pursuant to the AFCO Premium Financing Agreement, the Debtors are required to make a down payment of $242,420.80 (which payment was paid) followed by 9 monthly payments of approximately $126,225.94.

102.    On account of the policies financed with BankDirect, the Debtors owe total premiums of $105,391.00.  Pursuant to the BankDirect Premium Finance Agreement, the Debtors are required to make a down payment of  $10,500 (which payment was paid) followed by 9 monthly payments of approximately $10,798.55.

-28-

103.    A summary of the Financed Policies is a follows:

| Premium Finance Company | Policy Prefix and Numbers | Effective Date of Policy | Name of Insurance Company | Type of Coverage | Premium $ | Months Covered |
|---|---|---|---|---|---|---|
| AFCO | FM9405328-0 | 6/11/2018 | Argonaut Insurance Company | GL<br>Taxes<br>Fees | 924,636.00<br>0.00<br>0.00 | 12 |
| AFCO | FM9405329-0 | 6/11/2018 | Argonaut Insurance Company | GL<br>Taxes<br>Fees | 29,170.00<br>0.00<br>0.00 | 12 |
| AFCO | SLSTPTY11079718 | 6/11/2018 | Starr Surplus Lines Ins Co. | PROP<br>Taxes<br>Fees | 212,000.00<br>7,632.00<br>30,800.40 | 12 |
| AFCO | LHD423648 | 6/11/2018 | RSUI Indemnity Company | PROP<br>Taxes<br>Fees | 60,000.00<br>2,160.00<br>4,852.00 | 12 |
| AFCO | MKLV21XP002654 | 6/11/2018 | Markel American Insurance Co. | PROP<br>Taxes<br>Fees | 35,000.00<br>1,260.00<br>3,309.50 | 12 |
| AFCO | LPE1193583 | 6/11/2018 | United National Insurance Co. | PROP<br>Taxes<br>Fees | 38,500.00<br>1,386.00<br>5,989.45 | 12 |
| AFCO | N/A | 6/11/2018 | Hiscox Insurance Company Inc. | CR<br>Taxes<br>Fees | 4,719.00<br>0.00<br>0.00 | 12 |
| BANK DIRECT | N/A | 6/11/2018 | Zurich American Insurance Co. | Umbrella | 79,891.00 | 12 |
| BANK DIRECT | N/A | 6/11/2018 | National Surety Corporation | Excess Liability | 25,500.00 | 12 |

104.    The Debtors' obligations under the Financed Policies are secured by, among other things, any benefits paid and any additional premiums due under those policies, including dividends, gross unearned premiums, and payments on account of losses that result in a reduction of unearned premiums.  As of the Petition Date, the Debtors believe that they owe approximately $862,000 on account of the Premium Finance Agreements.  The Debtors are current with respect to all obligations under the Premium Finance Agreements, and respectfully request authority to pay all outstanding installment payments in connection with the Premium Finance Agreements in the ordinary course of business.

105.    The Debtors procure their Insurance Policies through Risk Management International (the "**Insurance Broker**").  The Insurance Broker assists the Debtors in obtaining comprehensive insurance coverage at competitive rates by evaluating benefit plan offerings.  The Insurance Broker collects commissions when the Debtors purchase coverage or when they remit premiums or Financed Payments.  The Debtors believe approximately $9,000 is owed to the Insurance Broker.  The Debtors seek authority to pay any prepetition amounts owed to the Insurance Broker to ensure uninterrupted coverage under the Insurance Policies.

I.      **Debtors' Motion for Entry of an Order: (I) Authorizing the Payment of Prepetition Claims Asserted Under the Perishable Agricultural Commodities Act; and (II) Granting Related Relief (the "PACA Motion")**

106.    Through the PACA Motion, the Debtors seek entry of an order (i) authorizing, but not compelling, the payment of prepetition claims arising under the under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq*. ("**PACA**"), and (ii) granting certain related relief.

107.    The Debtors believe that a certain portion of the products they have purchased but not yet paid for may qualify as "perishable agricultural commodities" under PACA.

-30-

108.    The Debtors purchase certain goods from suppliers that may be entitled to the protections under PACA (the "**PACA Claimants**").  The Debtors estimate that PACA Claimants held $100,000 or more in unpaid claims as of the Petition Date (the "**PACA Claims**").  Accordingly, through the PACA Motion, the Debtors seek authority to pay valid, pre-petition PACA Claims ("**Allowed PACA Claims**") in the ordinary course of business.  For clarity, not every claim held by a creditor that supplied perishable agricultural commodities will be entitled to the protection of PACA.  In addition, any supplier asserting a PACA Claim must comply strictly with the notice requirements set forth in PACA.  As such, the Debtors seek only the authority to pay Allowed PACA Claims, without prejudice to their right to challenge any claim asserted to be entitled to protection and/or treatment under PACA.

**J.      Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to: (A) Use Cash Collateral on an Emergency Basis Pending a Final Hearing; and (B) Grant Adequate Protection (the "Cash Collateral Motion")**

109.    Through the Cash Collateral Motion, the Debtors seek entry of an order (i) authorizing the Debtors to use the Cash Collateral (as defined herein) of Capital One; (ii) granting adequate protection to Capital One for the use of the Cash Collateral; (iii) modifying the automatic stay to the extent necessary to permit the Debtors and Capital One to implement the terms of the Interim Order; (iv) scheduling a final hearing on the Motion pursuant to Bankruptcy Rule 4001; and (v) granting related relief.

110.    The Debtors have an urgent and immediate need to use Cash Collateral. The Debtors do not have sufficient unencumbered funds on hand or generated from their businesses to fund operations.  Without the use of Cash Collateral as requested herein, the Debtors would not be able to implement the Store Closing Sales for the benefit of their stakeholders.

-31-

111.    The use of Cash Collateral is necessary for working capital, operating costs and expenses incurred during these Chapter 11 Cases, including funding payroll.  The Debtors do not have sufficient sources of working capital, financing or cash to carry on the operation of their businesses through the Store Closing Sales without the use of Cash Collateral.  The Debtors' ability to maintain their businesses pending the outcome of the Store Closing Sales and sale process is dependent on their ability to continue to operate, and the Debtors cannot operate unless they can fund payments for postpetition rent, payroll, goods, services and other operating expenses.  The use of Cash Collateral is thus essential to the Debtors' continued operational viability and will provide the Debtors with the opportunity to maximize value for their stakeholders.

112.    Hence, the Debtors determined, in the exercise of their sound business judgment, that they require the use of Cash Collateral under the terms of the Interim Order and Final Order.

**K.      Debtors' Emergency Motion for Interim and Final Orders: (I) Authorizing the Debtors to Assume the Consulting Agreement; (II) Authorizing and Approving the Conduct of Store Closing or Similar Themed Sales, With Such Sales to Be Free and Clear of All Liens, Claims and Encumbrances; and (III) Granting Related Relief (the "Consultant Motion")**

113.    Through the Consultant Motion, the Debtors seek entry of an order, (i) authorizing the Debtors to assume the Consulting Agreement (as amended, modified, or restated, and together with all exhibits, the "**Consulting Agreement**") between the Debtors and Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (collectively, the "**Consultant**"); (ii) authorizing the Debtors to conduct store closing sales or similar themed sales (defined herein as Store Closing Sales) in accordance with the proposed sale guidelines with such sales to be free and clear of all liens, claims, encumbrances, and interests; (iii) exempting the Debtors from compliance with certain applicable non-bankruptcy laws that purport to

-32-

regulate liquidation, similar-themed sales and signage limitations; (iv) exempting the Debtors from compliance with any contractual restrictions placed upon the Store Closing Sales; and (v) permitting the Debtors to abandon any property of the estates that is burdensome or of inconsequential value or benefit to the estates.

114.    Given the potential breadth of the Store Closing Sales, the Debtors have determined that hiring a liquidation consultant to assist them in running Store Closing Sales – including by providing supervisors to oversee the sales in-store, providing additional personnel to operate the stores as needed and recommending the appropriate mix and distribution of inventory among stores – would better enable them to maximize the value of their assets in these Chapter 11 Cases.

115.    In selecting a liquidation consultant, the Debtors solicited proposals from four nationally recognized liquidation consulting firms. The Debtors provided each of the firms with diligence information, including inventory and sales reports, and ultimately received two proposals for liquidation services to be provided on a fee (as opposed to equity) basis.

116.    The Debtors have decided to retain the Consultant because the Debtors, in consultation with SSG, determined that the Consultant's proposal offered the best value in terms of realization of net proceeds, execution risk, and timing.  The Consultant has extensive expertise in conducting store closing sales so as to be able to manage the orderly liquidation of the Merchandise (as defined in the Closing Store Agreement) and certain furniture, fixtures, equipment and other assets.  In short, the Consultant was retained because they are best suited to assist the Debtors in maximizing the value of the assets at the stores for the benefit of the Debtors and their creditors.

24888277.13 10/24/2018

117.    The Consulting Agreement was negotiated and entered into by the Debtors and the Consultant without collusion, in good faith and from arm's length bargaining positions.

118.    The Debtors are seeking to assume the Consulting Agreement so that they can benefit from the experience and resources that the Consultant has in performing large-scale liquidations, while at the same time retaining control over the sale process.  The Debtors believe this arrangement will maximize returns to creditors and provide for an efficient liquidation of their retail inventory, to the extent necessary.

[remainder of page left intentionally blank]

## PART III

## CONCLUSION

For the reasons stated herein and in each of the First Day Pleadings, the relief sought therein is in the best interests of the Debtors, their creditors and estates; and therefore, on behalf of the Debtors, I respectfully request that the First Day Pleadings be granted.

I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.

Executed this 24th day of October, 2018.

*/s/ Mark Samson*
Mark Samson

As Chief Restructuring Officer of NSC Wholesale
Holdings LLC, *et al*.

-35-