## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NSC WHOLESALE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 18-12394 (____) |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |
|  | ) |  |

### DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTORS TO ASSUME THE CONSULTING AGREEMENT; (II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE CLOSING OR SIMILAR THEMED SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF

The above-captioned debtors (collectively, the "**Debtors**") move, pursuant to sections 105, 363, 365 and 554 of the Bankruptcy Code and Rules 2002, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for the entry of (1) an interim order in the form attached hereto as **Exhibit A** (the "**Interim Order**"): (i) finding that the Consulting Agreement dated as of October 16, 2018, by and between the Debtors and a contractual joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "**Consulting Agreement**"), a copy of which is attached as Exhibit 1 to the Interim Order, is assumed on an interim basis; (ii) authorizing the Debtors to begin store closing or similar themed sales in accordance with the terms of the store closing sale guidelines (the "**Sale Guidelines**"), a copy of which is attached as Exhibit 2 to the Interim Order, with such sales to be free and clear of all liens, claims and encumbrances; and (iii) granting certain related relief, on an

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: NSC Wholesale Holdings LLC (6210); National Wholesale Liquidators of Lodi, Inc. (4301); NSC Realty Holdings LLC (4779); NSC of West Hempstead, LLC (5582); Top Key LLC (7503); BP Liquor LLC (2059); and Teara LLC (8660).  The Debtors' mailing address is 111 Hempstead Turnpike, West Hempstead, NY 11552.

interim basis (collectively, the "**Inventory Sale Relief**"), and (2) following service of this motion and after an opportunity to be heard at a final hearing (the "**Final Hearing**"), a final order (the "**Final Order**"), authorizing the assumption of the Consulting Agreement and granting the Inventory Sale Relief on a final basis.  In support of this motion, the Debtors incorporate the statements contained in the *Declaration of Mark Samson in Support of Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated by reference herein.

## BACKGROUND

### I.     General Background

1.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in the chapter 11 cases, and no statutory committees have been appointed or designated.

2.      The Debtors own and operate a chain of eleven (11) general merchandise close-out stores located in four (4) states.  The stores, which operate under the name "National Wholesale Liquidators," are targeted to lower and lower/middle income customers in densely populated urban and suburban markets.  The Debtors employ a unique hybrid merchandising strategy that employs both continuity and close-out products.  The Debtors offer customers both an everyday selection of first quality, brand name merchandise and opportunistic and varying special buys.

25415729.3 10/24/2018

3.      A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the above-captioned chapter 11 cases, are set forth in greater detail in the First Day Declaration.

4.      As detailed in the First Day Declaration, the Debtors' financial performance has suffered over the last few years from a number of factors, including declining sales, rising costs, certain construction-related damages and store opening delays.

5.      Notwithstanding these challenges, the Debtors believed their financial challenges could be overcome by access to additional liquidity to acquire more inventory and open additional retail stores.  For months prior to the Petition Date, the Debtors were negotiating with a group of industry players for a significant equity investment in the Debtors' businesses. Unfortunately, after substantially completing due diligence, the potential equity investors informed the Debtors that they were not prepared to move forward with an equity investment.

6.      Instead, the potential equity investors expressed interest in purchasing substantially all of the Debtors' assets through a sale under section 363 of the Bankruptcy Code. Similarly, another group, which includes one of the Debtors' insiders, also expressed an interest in purchasing a significant portion of the Debtors' assets and businesses as a going concern through a section 363 sale.

7.      In light of these expressions of interest, the Debtors retained an investment banker, SSG Advisors, LLC ("**SSG**"), to assist them in marketing their assets, negotiating with interested parties, and facilitating due diligence.

8.      Despite SSG's best efforts, none of the parties that expressed interest in purchasing the Debtors' assets as a going concern made a meaningful proposal that, in the

Debtors' view, would result in better value for the Debtors' estates than proceeding with store closing or similarly themed sales of the Debtors' inventory.

9.      Accordingly, the Debtors have determined that, under the circumstances, the best way to preserve value for their estates and creditors is to immediately commence Inventory Sales (as defined below) and, at the same time, pursue a sale process for any and all of the Debtors' remaining assets.  The Debtors believe this plan offers the best opportunity to maximize the value to the estates for all creditors and stakeholders.

## II.      The Proposed Inventory Sales

10.      Subject to a "fiduciary out" in the Consulting Agreement that permits the Debtors to, among other things, pursue a going concern sale of some or all of their stores and assets if an acceptable offer materializes during these bankruptcy cases, the Debtors seek to initiate an inventory sale process of Merchandise and Offered FF&E (both as defined below) that includes store closing and similarly themed sales (the "**Inventory Sales**") at the Debtor's retail locations (each a "**Store**" and collectively, the "**Stores**").

11.      Prior to the Petition Date, the Debtors' management, with the assistance of their advisors, performed an analysis of the Debtors' financial performance.  Such analysis included a comprehensive review of the performance of each store, the amount of Debtors' inventory on hand (the "**Merchandise**"), and the markets in which the Debtors operate.  As a result of this analysis, the Debtors have determined that it is necessary to initiate an inventory sale process in order to best maximize the value of their estates for the benefit of all creditors.

## III.      The Debtors' Selection of the Consultant

12.      To maximize the value of the property of the Debtors' estates that is attributable to the Stores, as well as certain of the associated furniture, fixtures and equipment ( the "**Offered FF&E**" and, together with the Merchandise, the "**Sale Assets**"), the Debtors and their advisors

4

contacted each of the four leading national asset disposition firms (the "**Disposition Firms**") that specialize in, among other things, the large scale sale of assets of the type owned by the Debtors. Ultimately, these four Disposition Firms split into two joint ventures and each joint venture submitted a bid to serve as the Debtors' consultant.

13.     Both bids contemplated asset disposition consulting agreements.   Asset disposition consulting agreements typically provide – in contrast to other agreements in which disposition firms take on all costs and responsibilities of managing closing sales and in return pay a guaranteed percentage of the cost of sold merchandise – that for an agreed upon fee, an asset disposition firm will give advice and assistance regarding any store closing sales and provide management oversight for the sales, but will not take on all costs and responsibilities of the sales.

14.     With SSG's assistance, and after several rounds of negotiations among the bidders and the Debtors with respect to the bids submitted by the two joint ventures, which resulted in significant reductions and concessions, the Debtors, together with their advisors, determined that entering into the Consulting Agreement with the contractual joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "**Consultant**") would minimize cost and maximize the value received from the Sale Assets.  Prior to the Petition Date, the Debtors and the Consultant executed the Consulting Agreement.

<u>**ASSUMPTION OF THE CONSULTING AGREEMENT AND
BEGINNING THE INVENTORY SALES**</u>

15.     By this motion, the Debtors are seeking the entry of interim and final orders authorizing the assumption of the Consulting Agreement and the Inventory Sales on the terms set forth in the Sale Guidelines.  This Court has previously entered "first day" relief authorizing assumption of pre-petition agreements on an interim basis to permit the commencement of

inventory sales, subject to a final hearing. *See, e.g.*, *In re Samuels Jewelers, Inc.*, Case No. 18-11818 (KJC) (Bankr. D. Del. Aug. 9, 2018); *In re Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); *In re Aerogroup Int'l Inc.*, Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017); *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016); *In re RadioShack Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015).

## THE CONSULTING AGREEMENT

16.     Pursuant to the Consulting Agreement, the Consultant will serve as the exclusive independent consultant to the Debtors in connection with the sale of the Sale Assets. Assumption of the Consulting Agreement will allow the Debtors to utilize the experience and resources of the Consultant in performing sales in a format that allows the Debtors to retain control over the sale process and will provide the maximum benefit to the estates.

17.     The primary services provided by the Consultant can be summarized as follows:[2]

(i)      provide qualified supervisors (the "**Supervisors**") engaged by Consultant to oversee the management of the Stores;

(ii)     determine appropriate point-of-sale and external advertising for the Stores, approved in advance by the Debtors;

(iii)    determine appropriate discounts of Merchandise, staffing levels for the Stores, approved in advance by the Debtors, and appropriate bonus and incentive programs, if any, for the Stores' employees, approved in advance by the Debtors;

(iv)     oversee display of Merchandise for the Stores;

---

[2]     Capitalized terms not otherwise defined herein have the meanings given to them in the Consulting Agreement.  To the extent that this summary differs in any way from the terms set forth in the Consulting Agreement, the terms of the Consulting Agreement control.  The Debtors refer the Court to the Consulting Agreement attached as Exhibit 1 to the Interim Order for a full exposition of the terms and conditions of the Consulting Agreement.

(v)    to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses;

(vi)    maintain the confidentiality of all proprietary or non-public information regarding the Debtors in accordance with the provisions of the confidentiality agreement signed by the Parties;

(vii)    assist the Debtors in connection with managing and controlling loss prevention and employee relations matters; and

(viii)    provide such other related services deemed necessary or appropriate by the Debtors and the Consultant.

18.    In consideration of its services, the Debtors shall pay the Consultant:

(i)    a fee equal to one and three quarters percent (1.75%) of the Gross Proceeds of Merchandise sold at the Stores, with "**Gross Proceeds**" meaning gross receipts calculated using the "Gross Rings" method, net of applicable sales tax; and

(ii)    a commission from the sale of any Offered FF&E equal to twenty percent (20%) of the Gross Proceeds of the sale of the Offered FF&E.

19.    The Debtors are also responsible for all expenses of the Inventory Sales, including without limitation all of the Stores' operating expenses and the Consultant's other reasonable, documented out of pocket expenses as set forth in the Consulting Agreement.  To control expenses of the Inventory Sales, the Debtors and Consultant have mutually agreed upon a budget of certain delineated expenses (the "**Expense Budget**"), attached to the Consulting Agreement as Exhibit B.  The Expense Budget may only be modified by mutual agreement of the Debtors and Consultant.

20.    Pursuant to the Consulting Agreement, the Consultant shall pay the Debtors an amount equal to ten percent (10%) of the gross proceeds (excluding sales taxes) from the sale of the Additional Consultant Goods (the "**Additional Consultant Goods Fee**"; as defined in the Consulting Agreement as "Additional Agent Goods" and "Additional Agent Goods Fee").

21.     As previously discussed, the Consulting Agreement also includes a "fiduciary out" provision that allows the Debtors to terminate the Consulting Agreement to pursue, among other things, a going-concern or partial going-concern sale, so long as the Debtors terminate the Consulting Agreement "prior to the point at which Consultant has materially performed" its obligations; provided that Consultant will be entitled to receive payment of all fees earned, all reimbursable expenses incurred, all Additional Consultant Goods sold before the effectiveness of such termination, and any other amounts incurred by Consultant under the Consulting Agreement prior to such termination.

**BASIS FOR RELIEF REQUESTED**

22.     The Debtors request authority to: (a) assume the Consulting Agreement; (b) conduct store closing or similar themed sales pursuant to the Sale Guidelines, with such sales to be free and clear of all liens, claims and encumbrances; and (c) receive certain related relief.

**I.      The Court Should Authorize the Assumption of the Consulting Agreement**

23.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard and it can only be overturned if the decision was a product of bad faith, whim or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

24.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).

25.     The assumption of the Consulting Agreement is beneficial to the Debtors' estates, and therefore is a reasonable exercise of the Debtors' business judgment.  As previously discussed, in order to maximize the value of its estates, the Debtors must sell the Merchandise as soon as possible, in an orderly manner.  Any delay in commencing the Inventory Sales will jeopardize the value that can be recovered during these bankruptcy cases.  In addition, the Consultant brings significant experience and expertise to assist the Debtors in conducting the Inventory Sales.  The Debtors and their advisors engaged in substantial efforts soliciting bids and negotiating with other national asset disposition firms before selecting the Consultant, and the terms set forth in the Consulting Agreement are the best alternative for the conduct of the Inventory Sales.  The terms of the Consulting Agreement are the results of arm's length bargaining and are the best terms available to the Debtors, as tested through a reasonable diligence process.

26.     The Consultant has extensive expertise in conducting asset disposition sales and can oversee, and assist in the management and implementation of, the Inventory Sales in an efficient and cost-effective manner.  Assumption of the Consulting Agreement will enable the

Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Inventory Sales for the benefit of all stakeholders.  If the Consulting Agreement is not assumed on an interim basis, there will be tremendous harm to all stakeholders.  Delay in commencing the Inventory Sales would lead to loss of value and increased administrative expense.

## II.     The Debtors Have a Valid Business Justification for the Inventory Sales

27.     Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).  When selling assets outside of the ordinary course of business, a debtor must articulate a valid business justification to obtain court approval.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Abbotts Dairies. Inc*., 788 F.2d 143,147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision); *Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same).  When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business

10

judgment rule has "vitality by analogy" in Chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).

28.     Store closing or asset disposition sales are a routine occurrence in chapter 11 cases involving retail debtors.  *See Ames Dept. Stores*, 136 B.R. at 359 (noting that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets").  As such, bankruptcy courts in this jurisdiction have approved similar store closing sales.  *See, e.g.*, *In re Samuels Jewelers, Inc.*, Case No. 18-11818 (KJC) (Bankr. D. Del. Aug. 9, 2018); *In re Rockport Co., LLC*, Case No. 18-11145 (LSS) (Bankr. D. Del. June 13, 2018); *In re Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); *In re Aerogroup lnt'1 Inc.*, Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017); *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016); *In re RadioShack Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015).

29.     Sufficient business justification exists to approve the proposed Inventory Sales under section 363(b)(1).  The Debtors, with the assistance of their advisors, have determined that the Inventory Sales, on the expedited basis set forth herein, represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Sale Assets.  There is a meaningful amount of Merchandise that, in the aggregate, will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced asset disposition firm.  Finally, to the extent there is another path that can provide even greater recoveries to the estate, the Debtors retain the ability to terminate the Consulting Agreement on ten days' notice, so long as the Consultant has not materially performed its obligations under the Consulting Agreement and the Consultant is compensated as provided in the Consulting Agreement.

**III.    The Court Should Approve the Sale of the Sale Assets Free and Clear of all Liens, Encumbrances and Other Interests under Bankruptcy Code Section 363(f)**

30.    The Debtors request approval to sell the Sale Assets on a final "as is" basis, free and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f); *Citicorp Homeowners Servs.. Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).  Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens.  *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

31.    Although the term "any interest" is not defined in the Bankruptcy Code, the Third Circuit has noted that the trend in modern cases is toward "a broader interpretation which includes other obligations that may flow from ownership of the property."  *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258-59 (3d Cir. 2000).  As the Fourth Circuit held in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996) (cited with approval by the Third Circuit in *Folger Adam*), the scope of section 363(f) is not limited to in rem interests in a debtor's assets.  Thus, a debtor can sell its assets under section 363(f) "free and

clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

32.     The Debtors' prepetition secured lender supports the assumption of the Consulting Agreement and recognizes the benefits provided to the estates.  With respect to any other party asserting a lien, claim, or encumbrance against the Sale Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  In connection with the sale of the Sale Assets, the Debtors propose that any liens, claims, and encumbrances asserted against the Sale Assets be transferred to and attach to the proceeds of the sale of the Sale Assets with the same validity and priority and to the same extent and amounts as such liens had with respect to the Sale Assets.

**IV.     The Court Should Approve the Proposed Sale Guidelines**

33.     As a necessary part of this process, the Debtors request the authority to conduct the Inventory Sales in accordance with the Sale Guidelines and without complying with applicable state and local laws, statutes, rules and/or ordinances governing store closing, liquidation or similar sales (collectively, the "**Liquidation Laws**").  Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Inventory Sales, many Liquidation Laws require special and cumbersome licenses, waiting periods, time limits and other procedures for store closing, liquidation or similar sales.

34.     To eliminate the time, delay and expense associated with the administrative procedures necessary to comply with the Liquidation Laws, the Debtors propose the Sale Guidelines as a way to streamline the administrative burdens on its estate while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Laws that may apply to the Inventory Sales.  As such,

13

the Debtors believe the Sale Guidelines mitigate any concerns that its landlords or governmental agencies may raise with respect to the Inventory Sales, and therefore, the below requested relief seeking the waiver of certain state and local laws and lease provisions is appropriate.

## V.    The Court Should Waive Compliance With Laws Regarding Inventory Sales

35.    Bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See Belculfine v. Aloe (In re Shenango Group, Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . .  [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).  Courts have found that preemption of state law is not appropriate if the laws deal with public health and safety.  *See Baker & Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake,  Inc.)*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).  However, preemption is appropriate where the only state laws involved concern economic regulation rather than the protection of public health and safety.  *See In re Baker & Drake, Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

36.    Under the circumstances of this case, enforcing the strict requirements of the Liquidation Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors.  Accordingly, authorizing the Inventory Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local

14

waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate.  The requested waiver is narrowly tailored to facilitate the successful consummation of Inventory Sales.  The Debtors do not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales.  In fact, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental and consumer protection laws, including consumer laws regulating deceptive practices and false advertising.

37.    Further, this Court has recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein.  *See, e.g., In re Rockport Co., LLC*, Case No. 18-11145 (LSS) (Bankr. D. Del. June 13, 2018) (stating that the debtors were authorized to conduct the store closing sales under the terms of the order "without any further showing of compliance" with liquidation laws); *In re Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018) (stating that the debtors are authorized to conduct the closing sales under the terms of the order "without the necessity of showing compliance" with liquidation laws); *In re Aerogroup Int'l Inc.*, Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017) (stating that "each and every federal, state, or local agency, departmental or governmental unit with regulatory authority over the Retail Inventory Liquidation Sales and all newspapers and other advertising media in which the Retail Inventory Liquidation Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any governmental unit shall be required, nor shall the Debtors be required to post any bond, to conduct the Retail Inventory Liquidation Sales"); *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016); (stating that "the Debtors shall be presumed to be in compliance with any Liquidation Laws and are authorized on an interim basis to conduct

the Closing Sales in accordance with the terms of this Interim Order and the Sale Guidelines without the necessity of showing compliance with any Liquidation Laws during the Interim Period"); *In re RadioShack Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015). (stating that "[p]rovided that the Inventory Liquidation Sales and the sale of Merchandise and FF&E are conducted in accordance with the terms of this Interim Order, the Consulting Agreement and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any GOB Laws and Liquidation Laws" without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws.).

## VI.    The Court Should Waive Compliance with Restrictions in the Leases

38.    Certain of the Debtors' leases governing the premises of the stores subject to any Inventory Sales may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In*

16

*re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

39.    In addition, this Court has held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.  *See, e.g., In re Rockport Co., LLC*, Case No. 18-11145 (LSS) (Bankr. D. Del. Jun. 13, 2018); *In re Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); *In re Aerogroup Int'l Inc.*, Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017); *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016); *In re RadioShack Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015).   Thus, as a result of the above and to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Inventory Sales, the Debtors request that the Court authorize the Debtors and/or the Consultant to conduct any liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

## VII.    The Court Should Approve the Abandonment of Certain Property In Connection with Any Inventory Sales

40.    After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."   11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

41.    The Debtors are seeking to sell certain Offered FF&E remaining in the Stores. However, the Debtors may determine that the costs associated with holding or selling certain property or Offered FF&E exceeds the proceeds that will be realized upon its sale, or that such

property is not sellable at all. In such event, the property is of inconsequential value and benefit to the estate and/or may be burdensome to retain.

42.     To maximize the value of the Debtors' assets and to minimize the costs to the estate, the Debtors respectfully request authority to abandon any of its remaining Offered FF&E or other property located at any of the Stores without incurring liability to any person or entity. The Debtors further request that the landlord of each Store with any abandoned Offered FF&E or other property be authorized to dispose of such property without liability to any third parties.

43.     Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (that is, information that alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

## VIII.  The Court Should Find That The Debtors Should Be Exempt From Any "Fast Pay" Laws

44.     Many states in which the Debtors operate also have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "**Fast Pay Laws**").  In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated. The sweeping nature of any Inventory Sales may result in a number of employees being terminated. The Debtors' payroll process may be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

45.     As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies.  Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

46.     To be clear, the Debtors intend to pay its terminated employees as expeditiously as possible and under normal payment procedures.  If the Debtors were required to technically comply with these state laws and regulations in its Inventory Sales, its efforts to engage in the Inventory Sales and stem unnecessary payroll costs may be hampered. Indeed, if forced to comply, the Debtors could face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of the Inventory Sales while payroll is prepared or (b) staging terminations to the detriment of the Debtors' estates.  Both of these choices will provide no benefit to the Debtors' estates and will only increase the administrative costs of conducting the Inventory Sales.

47.     Accordingly, the Debtors respectfully submit that, at least in regard to the proposed Inventory Sales, Fast Pay Laws are at odds with the underlying policies of the Bankruptcy Code and, as such, the Debtors should be granted relief from their requirements. *See, e.g., In re Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); *In re Aerogroup Int'l Inc.*, Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017); *In re RadioShack Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015).

## REQUEST FOR WAIVER OF STAY

48.     The Debtors also seek a waiver of any stay of the effectiveness of the orders approving the relief requested in this motion and the Order.  Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief

regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate" Further, pursuant to Bankruptcy Rule 6004(h), an order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the Debtors submit that ample cause exists to justify (a) the immediate entry of an order granting the relief sought herein and (b) a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

## CONSENT TO JURISDICTION

49.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this application if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## NOTICE

50.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee; (b) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis, excluding insiders); (c) Capital One, National Association; (d) the Office of the United States Attorney General for the District of Delaware; (e) the offices of the attorneys general for the states in which the Debtors operate; (f) the Internal Revenue Service; and (g) the landlords for the Stores; (h) Amalgamated Local 298 AFL-CIO; and (i) those parties who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

51.     No prior request for the relief sought herein has been made to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting, on an interim basis, (a) the Inventory Sale Relief, and (b) such other and further relief to the Debtors as the Court may deem proper, (ii) set a date for a Final Hearing on the assumption of the Consulting Agreement and the Inventory Sale Relief sought in this motion, and (iii) establish objection and reply deadlines for the Final Hearing, and (iv) grant such other relief as the Court deems just and proper.

Dated: October 24, 2018

**SAUL EWING ARNSTEIN & LEHR LLP**

By:     */s/ Mark Minuti*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
Aaron S. Applebaum (DE Bar No. 5587)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6840
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com
aaron.applebaum@saul.com

-and-

Jeffrey C. Hampton
Melissa A. Martinez
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
melissa.martinez@saul.com

*Proposed Counsel for Debtors and Debtors in Possession*